# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORDIA TOMPKINS,               )
    *Petitioner*,          )
                            )
    v.                         )
                            )   3:22-CV-00339 (OAW)
TIMETHEA PULLEN, PATRICK       )
MCFARLAND, and MICHAEL         )
CARVAJAL,                      )
    *Respondents*.         )
                            )
                            )

## <u>ORDER GRANTING IN PART WRIT OF HABEAS CORPUS</u>

**THIS CAUSE** is before the court upon Petitioner's Petition for Writ of Habeas Corpus ("Petition"). *See* ECF No. 1. The court has reviewed the Petition, Respondents' responsive Motion to Dismiss and memorandum in support thereof (together, "MTD"), *see* ECF Nos. 14 and 14-1, Petitioner's Memorandum in Opposition to the MTD, *see* ECF No. 15, Respondents' reply in support of the MTD, *see* ECF No. 21, all supporting exhibits, and the record in this matter and is thoroughly advised in the premises. For the reasons discussed herein, the court grants in part the Petition and grants in part the MTD.

## I.  BACKGROUND

The facts of this case are not in dispute. At the advent of the COVID-19 pandemic, Petitioner was incarcerated at the Federal Correctional Institute in Danbury, Connecticut ("FCI Danbury"). ECF No. 1 at ¶ 13. The Bureau of Prisons ("BOP"), under authority granted by Congress in the Coronavirus Aid, Relief, and Economic Security Act (better known as the "CARES Act"), released Petitioner to home confinement in June 2020.[1] *Id.*

---

[1] Petitioner's release also was pursuant to a temporary restraining order issued in an action brought against the warden of FCI Danbury, *Whitted v. Easter*, No. 20-CV-569-MPS. ECF No. 6 at 1.

Throughout her time on home confinement, Petitioner was supervised by staff at the Bronx Community Reentry Center ("BCRC").  *Id.* at ¶¶ 1, 19.  She reported to the BCRC twice monthly to check in with staff there and to undergo routine drug testing.  *Id.* at ¶ 20.  The terms of her home confinement were such that Petitioner was not permitted to leave her home except for work and for other approved departures, and even then, Petitioner only was permitted to visit pre-approved locations.  ECF No. 14-1 at 2–3.

Upon her release, Petitioner reunited with her children (one of whom she successfully petitioned to have returned to her from foster care), enrolled in cosmetology school, and secured employment.  ECF No. 1 at ¶ 17.  She remained on home confinement, with an ankle monitor, for approximately one year.  *Id.* at ¶ 30; ECF No. 21 at 4.

There is no record of Petitioner violating any conditions of her home confinement until May 6, 2021 (almost one year into her release).  On that day, while Petitioner was out on an approved pass to attend class, BCRC staff tried multiple times to reach her both by her home phone and by her cell phone.  In return, Petitioner called the BCRC to report that she was having car trouble but that she was close to her house.  ECF No. 14-1 at 3; *see also* ECF No. 14-3 at 7.  She arrived home at 8:57 p.m., which was 57 minutes after her curfew.  ECF No. 14-3 at 7.  An incident report was issued pursuant to the infraction and was delivered to Petitioner on May 7.  *Id.*  While the report noted that Ms. Tompkins's location was tracked, it gave no specific information as to where she had been (or as to any inherent dangers or concerns specifically related to such identifiable location).  *Id.* There is no record of any further proceedings related to the May 6 incident.

On June 10, 2021, remote monitoring showed Petitioner to be at an unauthorized location.  ECF No. 14-1 at 3; *see also* ECF No. 14-3 at 9.  There are no further details in the record about what that location was or why Petitioner was there.[2]  Another incident report was issued pursuant to that infraction and was delivered to Petitioner on June 11, 2021.  ECF No. 14-3 at 9.  There is no record of any further proceedings related to the June 10 incident.

On June 21, 2021, Petitioner reported to the BCRC for her regular check-in, and informed staff there that her phone was not working and that she intended to stop at an AT&T store before going home.[3]  ECF No. 1 at ¶ 22.  She did in fact stop at the store, and then she went home.  *Id.*  Despite the advance notice, the BCRC counted the stop as another infraction because they deemed the AT&T store to be an unauthorized location.  *Id.* at ¶ 23.  Petitioner was instructed to report back to the BCRC the next day, and when she did, an incident report related to this alleged infraction was delivered to her.  *Id.* at ¶¶ 22–23; *see also* ECF No. 14-3 at 11.

At some point within the following few days, Petitioner was informed that she would be subject to a disciplinary hearing before the BCRC's Center Disciplinary Committee ("CDC") regarding the June 21 infraction, and she was informed of her rights with respect to that hearing.  ECF No. 14-1 at 4.  On June 28, 2021, Petitioner waived her right to have at least 24 hours' notice of the charges against her so that her hearing might go forward the same day.  *Id.*; *see also* ECF No. 14-2 at 14.  She also declined the assistance of a

---

[2] However, the court may take judicial notice of information which is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(c).  It appears from publicly-available online information that the address in question was a Mexican restaurant.  The court draws no conclusions or inferences from this information.
[3] Maintaining a working phone was a condition of Petitioner's home confinement.  ECF No. 1 at ¶ 21.

staff member and waived her right to bring witnesses on her own behalf.  ECF No. 14-1 at 4; ECF No. 14-2 at 16.  The only documentary evidence she gave in her own defense was her own written statement.  ECF No. 14-1 at 4; ECF No. 14-2 at 19.  She also made an oral statement at the hearing.  ECF No. 14-2 at 17.  The disciplinary committee that presided over the June 28 hearing recommended that Petitioner be sanctioned with the loss of good time.  ECF No. 14-2 at 17.  However, the BOP Disciplinary Hearing Officer ("DHO") who reviewed the hearing report found the CDC's suggested sanction too harsh, and reduced it to a 14-day loss of privileges while in community custody (with BCRC staff to determine which privileges should be lost while Petitioner remained in the community).  *Id.* at 17; *see also id.* at 4.

The DHO (Nichole Hayden) was responsible for certification of the committee's proceedings by determining whether it had complied with BOP policy.  *Id.* at 4.  DHO Hayden was provided with the records necessary to evaluate the June 28 disciplinary committee recommendation on or about July 8, 2021.  *Id.*  On July 8, 2021, DHO Hayden: determined that the disciplinary committee's proposed sanction was disproportionate to the offense committed; reduced the proposed sanction from Petitioner's loss of good time to Petitioner's loss of privileges; and issued her DHO certification.  *Id.* at 4, 17, 22.  To be clear, DHO Hayden's reduced sanctions did not include a request to order that Petitioner be remanded to the physical custody of a BOP prison by redesignation to any such facility.  *Id.* at 4.  Nevertheless, on July 6, 2021, Petitioner was remanded to secure custody and was redesignated to FCI Danbury, "a facility commensurate with her security and programming needs."  ECF 14-3 at 3.  Two days before DHO Hayden reduced the June 28 recommendation of Petitioner's loss of good time to her loss of privileges within

community custody, Residential Reentry Manager Patrick McFarland found Petitioner to be "inappropriate for community confinement" altogether and instead ordered her return to prison.  *Id.*

 In fact, as early as June 25, 2021, several days before Petitioner's June 28 hearing, BCRC staff notified Respondent McFarland via email that the June 21 incident had been Petitioner's third infraction in two months, and that "[s]taff continues to have to remind [Petitioner] to charge her ankle monitor because she will allow it to die."  ECF No. 15-1.   Unbeknownst to Petitioner, Respondent McFarland replied via email (the "McFarland Email"), "Pull her in today and once you confirm [the Center Discipline Committee hearing] is complete we will send remand."  *Id.*  Petitioner was remanded to the Metropolitan Detention Center in Brooklyn and then to FCI Danbury, *see* ECF No. 1 at ¶ 30, where she remained until her May 31, 2022 re-release back to community confinement, *see* ECF No. 22.

Ms. Tompkins filed her habeas petition on March 2, 2022, alleging violations of the Constitution, administrative law, and the Rehabilitation Act.   The court ordered Respondents to show cause why the petition should not be granted, and Respondents filed the instant motion to dismiss, which presently is fully briefed.

## II.  LEGAL STANDARD

Under 28 U.S.C. § 2241, "the federal courts have the power to grant writs of habeas corpus [o]n behalf of, *inter alios*, prisoners who are 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Poindexter v. Nash*, 333 F.3d 372, 377 (2d Cir. 2003) (quoting 28 U.S.C. § 2241) (internal citations omitted).   A petition

pursuant to § 2241 is an appropriate vehicle in which to challenge the execution of a sentence, including the conditions of confinement.  *Id.*  Petitioner "bears the burden of proving that [s]he is being held contrary to law; and because the habeas proceeding is civil in nature, [she] must satisfy [t]his burden of proof by a preponderance of the evidence."  *McDonald v. Feeley*, 535 F. Supp. 3d 128, 135 (W.D.N.Y. 2021) (quoting *Dzhabrailov v. Decker*, No. 20-CV-3118 (PMH), 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020)).

It is axiomatic, however, that an action must be dismissed where the facts alleged in the complaint are insufficient to state a plausible claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This axiom is no less true for habeas petitions.  *See Dimartino v. Sage*, No. 3:21-CV-00498 (KAD), 2022 WL 124308, at *2 (D. Conn. Jan. 13, 2022).  To avoid dismissal under Rule 12(b)(6),[4] a party must plead "enough facts to state a claim to relief that is plausible on its face," and not merely "conceivable."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When reviewing a motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the nonmovant's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III.   DISCUSSION

Petitioner asserts that Respondents' conduct violated her substantive and procedural due process rights under the Fifth Amendment, her rights under the Eighth Amendment, and the principle laid out in *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)

---

[4] Although this action is proceeding under the Rules Governing Section 2254 Cases, Rule 12 of those Rules permits the Federal Rules of Civil Procedure to be incorporated.  *See* SECT 2254 Rule 12.

(often called the "*Accardi* principle"), that, as applied to these circumstances, requires the BOP to follow its own regulations.  She further asserts that Respondents have violated the Rehabilitation Act because they did not accommodate her anxiety disorder in its disciplinary proceedings.  She seeks: declaratory judgment (pursuant to the Declaratory Judgment Act, or "DJA") that her rights were violated, her immediate release, an injunction prohibiting her reincarceration absent correction of the alleged violations, and compensation to recover her attorneys' fees and costs.

### a.  Procedural Due Process Claim

"[T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime."  *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974).  Those rights, however, are necessarily subject to restrictions and limitations in the carceral environment.  *Id.* at 556.  In order to state a procedural due process claim, Petitioner must show that she has a protected liberty interest in freedom from certain government action.

The Supreme Court consistently has held that while the Due Process Clause alone "confers no liberty interest in freedom from [government] action taken 'within the sentence imposed,'" it is possible for a government to create a liberty interest.  *Sandin v. Conner*, 515 U.S. 472, 477–78 (1995) (citing *Wolff*, 418 U.S. at 557);[5] *see also Wilkinson v. Austin*,

---

[5] The court notes that *Sandin* and *Wolff* specifically addressed liberty interests created by *state* actions. Respondents do argue that Petitioner had no liberty interest because she was in *federal* custody, but it is not clear whether they intend to argue that the federal government cannot, under any circumstances, create a liberty interest in the same way state governments can, or whether they simply intend to argue that the relevant federal framework does not support the finding of a liberty interest.  If the former, they have provided no rationale for such a distinction, and the court can discern none.  Furthermore, given that courts of appeals throughout the country have applied *Sandin* to federal confinement, the court will assume they intend the latter.  *See, e.g. Magluta v. Samples*, 375 F.3d 1269 (11th Cir. 2004); *Iqbal v. Hasty*, 490 F.3d 143, (2d Cir. 2007), rev'd and remanded on other grounds sub nom. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2000); *Richardson v. Joslin*, 501 F.3d 415 (5th Cir. 2007), *Fiorentino v. Biershbach*, 64 F. App'x 550 (7th Cir. 2003).

545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by . . . laws or policies.") (internal citation omitted).     The appropriate inquiry for determining whether a government has created such a liberty interest, though, has evolved throughout Supreme Court jurisprudence.  The court briefly will summarize this evolution before applying relevant law to the facts of this case.

In *Morrissey v. Brewer*, 408 U.S. 471 (1972), the Court reviewed the claims of two habeas petitioners who had been paroled from Iowa prisons and reincarcerated for violating the conditions of their parole.  Neither one received a hearing before his parole was revoked, and each of them claimed that he had been denied due process.  The Supreme Court began its review of the matter by describing parole as "an established variation on imprisonment of convicted criminals" designed to "help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed."  *Morrissey*, 408 U.S. at 477.  The Court identified the essence of parole as "release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."  *Id.*  The Court applied the then-governing "grievous loss" standard and found that parole, though only a conditional liberty, "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."  *Id.* at 482.  Thus, the Court concluded that the *Morrissey* petitioners did have a liberty interest in remaining on parole, stating that even such conditional liberty "[b]y whatever name," is "valuable," and "[i]ts termination calls for some orderly process, however informal."  *Id.* at 482.

Only a few years after the Court decided *Morrissey*, it took up *Wolff.* *Wolff* dealt with a civil rights complaint brought by a Nebraska prisoner alleging that certain disciplinary proceedings, which resulted in the loss of good time credit, did not comply with due process requirements.  The Court found that the State of Nebraska had created a liberty interest by passing a law which entitled prisoners to good time credit and which specified that the loss of good time credit only could result from serious misconduct. *Wolff,* 418 U.S. at 557–58.  Therefore, the Court concluded that certain process was due, though not quite so much process as *Morrissey* had required (given the different circumstances presented by the cases).  *Id.* at 563–64.

Again, only a few more years later, the Court issued its opinion in *Meachum v. Fano*, 427 U.S. 215 (1976).  There, several inmates in the custody of Massachusetts, pursuant to proceedings held by their prison's Classification Board, had been transferred to higher-security prisons after having been found responsible for some violent unrest at the prison.  The Court concluded that Massachusetts law did not confer any liberty interest upon its inmates, since confinement in any of the state's carceral facilities was within the normal limits of custody, and unlike in *Wolff*, Massachusetts law did not create any right to remain in any particular facility or predicate transfers between facilities upon any type of conduct.  *Meachum*, 427 U.S. at 226–27.  The Court noted that it was irrelevant that transfers often were responsive to disciplinary issues amongst inmates, finding that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."  *Id.* at 228.

Courts thereafter began focusing on whether a particular government action was mandatory or discretionary, instead of looking at the nature of the restriction imposed, which resulted in due process claims being decided through mechanical interpretation of the specific language of prison regulations.  *Sandin*, 515 U.S. at 479–81.

In *Sandin*, though, the Court explicitly departed from this method and "return[ed] to the due process principles [it] believe[d] were correctly established and applied in *Wolff* and *Meachum*."  *Id.* at 483.  It established a new standard for assessing jail-related due process claims, holding that a restraint imposed upon on prisoner must present an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" in order to "create liberty interests … protected by the Due Process Clause." *Id.* at 484.

Under the "atypical and significant hardship" standard, the Supreme Court has found that there is no established liberty interest in a confined prison inmate avoiding a 30-day assignment to segregated confinement, *see id.* at 485, but that a liberty interest exists to protect inmates from their indefinite placement into a supermax facility if such transfer disqualifies them from parole eligibility, *see Wilkinson*, 545 U.S. at 224.  The Court also has found that denial of clemency is not so "atypical and significant" as to implicate the Due Process Clause.  *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 282 (1998).

Since *Sandin*, however, courts have continued to rely on *Morrissey* in determining whether a restriction implicates a liberty interest, though only in narrow circumstances. In *Young v. Harper*, 520 U.S. 143 (1997), an inmate in the custody of the state of Oklahoma was granted pre-parole conditional release and simultaneously was

recommended for more traditional parole (Oklahoma had two separate programs: parole, and a Preparole Conditional Supervision Program).  *See Young*, 520 U.S. at 143, 145. He was not accused of noncompliance during the five months that he was out of prison on pre-parole; nevertheless, he was denied parole and was returned to prison.  The inmate then filed a petition for a writ of habeas corpus, claiming his return to prison deprived him of liberty without due process.  The Court first cited *Morrissey* in describing liberties afforded while on parole:

> [The parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison.... The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.

*Young*, 520 U.S. at 147–48 (quoting *Morrissey*, 408 U.S. at 482) (further modifying the original modification in *Young*, for context).[6]  This description, the Court found, "could just as easily have applied" to the Oklahoma pre-parolee, who maintained his own residence, secured gainful employment for himself, and "lived a life generally free of the incidents of imprisonment."  *Id.* at 148.  While the pre-parolee's liberty was not unlimited (he was forbidden from using alcohol, from incurring debts that were not educational in nature, and from travelling outside the county without permission, and he was required to regularly report to a parole officer), the Court found that similar restrictions also applied to the parolees in *Morrissey*, but that the restrictions did not "render [their] liberty beyond procedural protection."  *Id.*  The Court concluded that Oklahoma's pre-parole program was so similar to the parole program presented in *Morrissey* that *Morrissey* was

---

[6] The initial word in this block quote originally appeared as "he" in *Morrissey*, but was modified to "[H]e" in *Young*.  This court's further modification to "[The parolee]" simply is for additional context as used here.

controlling, and thus the pre-parolee did have a liberty interest that entitled him to *Morrissey* protections.  *Id.* at 152-53.  The Court did not apply the "atypical and significant hardship" test.

Finally, in *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999), an inmate in the custody of the state of New York was placed into a work release program after serving part of a prison sentence.  The program allowed her to live at home while working, so long as she regularly reported to corrections officials.  She was accused of using opiates while in the program, and this precipitated a sequence of events that resulted in her being removed from the work program without notice.  The Second Circuit found that the work release program was "virtually indistinguishable" from the programs at issue in *Morrissey* and *Young*, and that the petitioner therefore had a liberty interest in remaining in the program "the loss of which imposed a sufficiently 'serious hardship' to require compliance with at least minimal procedural due process."  *Kim*, 182 F.3d at 118.

Against this legal backdrop, Petitioner argues that the BOP's home confinement program is so similar to the work release, pre-parole, and parole programs at issue in *Kim*, *Young*, and *Morrissey* that, like the inmates in those cases, she had a liberty interest in remaining in home confinement.  She further argues that her reincarceration was unlawful because she was not afforded due process.  Respondents, on the other hand, contend that: (1) Petitioner's remand to prison was a redesignation that was within the BOP's sole discretion and that did not trigger the need for due process; (2) Petitioner had no liberty interest in remaining on home confinement and thus was not entitled to the

procedural due process of a revocation hearing;[7] and (3) Petitioner was afforded all the process she was due at her disciplinary hearing.   The court will examine Respondents' arguments seriatim.

### i. *Redesignation*

Federal law clearly grants the BOP the sole, broad authority to decide where to house prisoners, and to transfer them between facilities.  *See* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment . . ." and may "direct the transfer of a prisoner from one penal or correctional facility to another."). Similarly, courts cannot instruct BOP where to house its inmates, *see id.* ("[A] designation of a place of imprisonment under this subsection is not reviewable by any court."), and traditionally have not interfered with the administration of prisons, *see, e.g., Meachum v. Fano*, 427 U.S. 215, 228–29 (1976) (cautioning against "involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges.").  Therefore, this court approaches Petitioner's claims with due regard.

Still, the court does not accept the government's characterization of the BOP's remand and redesignation authority as "sacrosanct," as it was described at oral argument. Whereas the Constitution of the United States may be regarded as sacrosanct, the same is not true of the discretionary actions of the BOP or of the court; precedent is a basic principle in our system of justice, but rulings of this district court and even of the Supreme Court of the United States "are not sacrosanct."  *Hurst v. Florida*, 577 U.S. 92, 102 (2016)

---

[7] Though typically "[a]rguments may not be made for the first time in a reply brief," *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993), and Respondents only raise this argument in their reply brief, the court will address it here.

(citations omitted) (internal quotations omitted).  Accordingly, this court reviews the constitutionality of alleged due process violations raised by habeas petitions.

The court questions Respondents' position that revocation of Petitioner's home confinement was an action taken within the broad authority of § 3621(b).  That statute specifically states that the BOP may designate prisoners to, and transfer them between, *penal and correctional facilities*.  It is not at all clear that an individual's private residence qualifies as such a facility.  In fact, the BOP appears to interpret the phrase "penal and correctional facility" to *exclude* private residences, as is clear from its belief that it cannot designate an individual to home confinement at the start of the inmate's sentence.  *See* BOP Program Statement 7320.01(1); ECF No. 31-3 at 4 ("The Bureau does not have statutory authority to designate a home confinement program for an inmate at the beginning of his or her sentence. This is supported in Title 18, U.S.C., Section 3621, which requires that the Bureau designate any available **penal or correctional facility** as the place of a prisoner's imprisonment.") (emphasis in original).  While there is little caselaw on this issue, at least one district court has agreed with the BOP's interpretation. *See Flores v. Berkebile,* No. 3:07-CV-0778-B, 2008 WL 623385, at *14 (N.D. Tex. Mar. 5, 2008) ("[H]ome confinement does not equate to a penal or correctional facility . . . ."). Accordingly, the BOP's authority to release an inmate to home confinement solely seems to flow from § 3624(c),[8] and Respondents' reliance upon § 3621(b) appears to be misplaced.

---

[8] 18 U.S.C. § 3624(c) relates to "prerelease custody" wherein the BOP is authorized to release an inmate from the physical confines of prison before completion of the jail term to which the inmate was sentenced. Subdivision (2) specifically deals with home confinement.

14

Respondents attempt to characterize Petitioner's reincarceration as a mere "redesignation," but it seems clear from the record that the reincarceration was in fact a sanction for misbehavior. In its briefings and at oral argument, the government has stated on multiple occasions that Respondent McFarland ordered Petitioner's remand to prison *because of* the alleged violations of the conditions of her home confinement. *See, e.g.,* ECF No. 14-1 at p. 6 ("Following Petitioner's third Code 309 violation, and *based on* Petitioner's most recent documented behavior and repeated failure to comply with [BCRC] rules and regulations, [Respondent McFarland] determined Petitioner to be inappropriate for community confinement.") (emphasis added); *id.* at p. 10 ("Petitioner's redesignation to secure custody was a permissible action, taken after she proved herself incapable of complying with the conditions of community custody through her repeated misconduct; specifically, ***three Code 309 violations in as many months***.") (emphasis in original); ECF No. 14-3 at ¶ 8 ("*Based on [Petitioner's] most recent documented behavior and repeated failure to comply with [BCRC] rules and regulations, [Respondent McFarland] determined her to be inappropriate for community confinement.*") (emphasis added).[9]  Indeed, the McFarland Email makes clear that Petitioner's remand was *because of* her alleged misbehavior. *See* ECF No. 15-1. And finally, the community supervision agreement,[10] which noted Petitioner's home confinement conditions, listed only one potential trigger of a BOP "administrative reassignment" out of the program: a refusal to participate in the home confinement program.[11] ECF No. 14-2 at 6.

---

[9] The government also stated at oral argument that Respondent McFarland determined petitioner to be inappropriate for community confinement due to the three alleged violations.

[10] The court notes that this agreement is dated January 25, 2021, six months after Petitioner was placed on home confinement. Whether another agreement governed Petitioner's conduct prior to this date is inconsequential because all of the pertinent alleged violations occurred after this date.

[11] In addition to this one delineated way to be *administratively reassigned*, the agreement also listed noncompliance that could result in discipline. For example, it states that failure to remain at one's

Moreover, § 3621(b) requires consideration of certain factors before determining an inmate's proper place of imprisonment, such as security concerns, a prison's population and bed availability, and a prisoner's faith-based, programmatic, or mental health needs.  The record does not reasonably support the claim that assessment of these factors resulted in Petitioner's return to FCI Danbury.  Although Respondent McFarland states in an affidavit appended to Respondents' MTD that Petitioner was returned to secure custody in a facility "commensurate with her security and programming needs", ECF No. 14-3 at p. 3, ¶ 8, those needs never have been identified for the court or in the record.  At oral argument, the government was unable to persuasively and specifically articulate any of Petitioners' security or programming needs that were not being addressed in home confinement but that could be (or that were) provided in prison. And it appears from the McFarland Email that the decision to reincarcerate Petitioner was made summarily.   ECF No. 15-1.  Therefore, it is unclear that Petitioner's remand to secure custody was a redesignation made within the broad authority granted to the BOP by Congress in § 3621(b), even if that section were applicable here.

Finally, even assuming that Petitioner's reincarceration was a redesignation authorized by statutory authority, the fact remains that Congress cannot grant the BOP authority to violate the Constitution; statutorily-authorized action can be deemed unconstitutional.  And of course, even if Petitioner's reincarceration was a sanction, disciplinary action does not automatically affect a liberty interest.[12]  *See Sandin*, 515 U.S.

---

approved residence "may result in disciplinary action and/or prosecution for escape."  ECF No. 14-2 at 6. The agreement also requires compliance with electronic monitoring conditions, where applicable.  *Id.* And it would have allowed the BOP to transfer Petitioner to a suitable facility for the purposes of medical care if deemed necessary.  *Id.*

[12] However, Respondents seem to concede that a liberty interest *would* arise in this case if the decision to reincarcerate were a disciplinary sanction.  They footnote in the MTD that "repeated instances of 300-

at 484.  At bottom, this case turns on the constitutional rights (if any) Petitioner had while on home confinement, and whether those rights were violated.  The court must make these determinations regardless of the applicability of § 3621(b).  Consequently, Respondents' argument claiming statutory authority must be reviewed within the context of any existing and implicated liberty interest.

### ii.  *Liberty Interest*

In the context of this case, government action affects a liberty interest when an imposed restraint results in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin,* 515 U.S. at 484.  Inmate discipline may be used toward prison management and inmate rehabilitation, but "prisoners do not shed all constitutional rights at the prison gate."  *Id.* at 485.  Here, Petitioner was in the community on home confinement (and not in a traditionally custodial setting such as a prison) at the time of the relevant government action remanding her to secure prison custody, yet Respondents argue that Petitioner's remand to custody was not atypical and significant enough to impact a liberty interest. Respondents primarily cite to cases involving initial denials of compassionate release from prison, *see, e.g., United States v. Javed*, 2021 WL 2181174 (S.D.N.Y. May 27, 2021); *Dov v. Bureau of Prisons*, 2020 WL 3869107 (S.D.N.Y. July 9, 2020), and habeas petitions often brought by self-represented prisoners who were denied release from prison to community confinement, *see, e.g., United States v. Spaulding,* 2021 WL 4691140 (S.D.N.Y. October 6, 2021); *United States v. Konny*, 463 F. Supp. 3d 402, 405 (S.D.N.Y. 2020); respondents do not instead refer the court to cases involving petitioners who were remanded to jail from within the

---

level misconduct within a 12-month period do allow higher sanctions to be imposed, invoking due process protections to include a disciplinary hearing."  ECF No. 14-1 at 11 n.4.

community.  In fact, only one case cited by Respondents, *Hatch v. Lappin*, 660 F. Supp. 2d 104 (D. Mass. 2009), deals with an individual on home confinement who was reincarcerated by the BOP when the petitioner violated his conditions of home confinement.  In *Hatch*, the petitioner argued that his reincarceration violated his Fifth Amendment right to procedural due process.  In that instance, the United States District Court for the District of Massachusetts found that "regression from home confinement to imprisonment . . . does not constitute . . . an 'atypical and significant hardship.'"  660 F. Supp. 2d at 112.[13]

*Hatch* is not precedent binding upon this court, and this court respectfully is not persuaded by its reasoning.  The *Hatch* ruling relied upon the facts that (1) the petitioner's entire sentence could have been spent in prison, and (2) home confinement was defined as a "privilege, not a right" in the relevant program statement.  *Id.*  The Supreme Court of the United States "has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'"  *Morrissey*, 408 U.S. at 481 (citing *Graham v. Richardson*, 403 U.S. 365, 374 (1971)).  And in *Morrisey* and *Young*, 520 U.S. 143 (1997), the Supreme Court found those on parole and pre-parole, respectively, had a liberty interest in remaining out of prison, despite the fact that the prisoners had been released onto such status before their prison sentences had expired.

Petitioner, on the other hand, does not address the *Sandin* test, but urges the court to follow *Morrissey*, *Young*, and *Kim* by finding home confinement so similar to the parole, pre-parole, and work release programs at issue in those cases, that home confinement

---

[13] The *Hatch* court did conclude, however, that when a liberty interest is affected, procedural due process requires a hearing with advance notice, the right to present evidence and to call witnesses, and the right to be given reasons for any disciplinary action (including evidence upon which the factfinder relied in arriving at its conclusions).  *See infra* pp. 25–29 (Part III (a) (iii): Procedure Due).

also must create a liberty interest.  Respondents disagree.[14]  They assert that Petitioner's reliance upon *Morrissey*, *Young*, and *Kim* is misplaced because home confinement is not analogous to parole.  They first repeat their argument that the BOP's authority under § 3621(b) permitted the BOP to remand Petitioner to prison without impacting any liberty interest.  *See* ECF 14-1 at 8.  The court already has questioned the applicability of § 3621(b) in this instance, but its applicability would not be dispositive in this context. Justice Douglas noted in the *Morrissey* dissent that the statute there at issue allowed parolees to be taken into custody and returned to prison at any time.  *Morrissey*, 408 U.S. at 492–93.  Nevertheless, the majority found the parolee to have had a liberty interest while on parole.  In assessing the creation of liberty interests, *Sandin* also seemed to find less importance in whether legislative verbiage was mandatory or discretionary in nature. *See Sandin*, 515 U.S. at 479-81.

Respondents next argue that Petitioner's release from prison was not like those of the prisoners in *Morrissey*, *Young*, and *Kim* because the programs in those cases were designed to perform a particular function in the correctional process, that is, reintegration into society.  However, Respondents contend that Petitioner was placed in home confinement pursuant to the CARES Act for the purpose of mitigating the risks presented by a global pandemic, and not for the purpose of reintegrating her into her community.

This argument is unavailing.  By statute, home confinement is designed to afford prisoners an "opportunity to adjust to and prepare for the reentry … into the community." 18 U.S.C. § 3624(c)(1).  There is nothing in the CARES Act that indicates a Congressional intent to abrogate this language.  That the CARES Act authorized the BOP to start certain

---

[14] Again, the court discusses Respondents' counterarguments on this point although they are only included in the reply brief.

individuals on this path to reentry earlier than previously was permissible did not change the purpose of home confinement.  If that were the case, then individuals placed on home confinement pursuant to the CARES Act would have been instructed simply to remain at home, alone, at all times, without welcoming family back into those homes, and without any opportunity to pursue employment or education.  But that is clearly not what the CARES Act demanded, and it is not what the BOP implemented.  Furthermore, the Supreme Court rejected a similar argument in *Young*, where the pre-parole program in question released prisoners to prevent overcrowding in Oklahoma prisons. 520 U.S. at 149.  So even if the court were to agree with Respondents that home confinement pursuant to the CARES Act is distinct from home confinement more generally, caselaw inevitably would lead the court to conclude that the distinction is irrelevant.

Respondents next argue that Petitioner's circumstances on home confinement were not like those of the petitioners in *Morrissey*, *Young*, and *Kim* because Petitioner wore an ankle monitor, could not leave her home without permission, and at all times remained subject to BOP policies.  But electronic monitoring is a condition of release similar to the agency disciplinary policies implicated in *Morrissey* and *Kim* that resulted in reincarceration due to their violation.  And while Petitioner's location constantly was tracked via ankle monitor, Petitioner's home confinement also arose several decades after *Morrissey*, *Young*, and *Kim*, allowing technological advancements to offer additional options for monitoring inmates released into community supervision settings. Furthermore, while Petitioner's movements were restricted to a greater extent than that of a parolee, who needs permission to travel outside the community as in *Morrissey*, 408 U.S. at 478, and that of a pre-parolee, who needs permission to travel outside the county

as in *Young*, 520 U.S. at 148, home confinement within one's community unquestionably is more analogous to parole and to pre-parole than it is to confinement within a prison. *See Morrissey*, 408 U.S. at 482 ("Though the State properly subjects [the parolee] to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison."). And as the Supreme Court has pointed out, simply because liberty is limited, that does not render it "beyond procedural protection." *Young*, 520 U.S. at 148. Greater travel restrictions for individuals on home confinement than on parole or pre-parole do not appreciably diminish the involved liberty interest, particularly where individuals on home confinement are permitted to leave their homes for classes or work, and are able to live with and to care for their families. Rather than being isolated within her residence, Petitioner attended cosmetology classes five days per week, *see* ECF No. 15 at 2, attained gainful employment, reunited her family, and maintained her own private residence. Though her movements were monitored, Petitioner, like the complainants in *Morrissey*, *Young*, and *Kim*, was able to resume a fairly normal life. Her state of life, though more restrictive than that in *Morrissey*, *Young*, and *Kim*, remained "very different from that of confinement in a prison." *Morrissey*, 408 U.S. at 482.

Also, while not binding upon this court, the Ninth Circuit Court of Appeals has recognized that home confinement is distinct from incarceration, and under similar reasoning has held that criminal defendants are not entitled to pretrial jail credit (which would be applied against their sentences) for time spent under house arrest. *Fraley v. U.S. Bureau of Prisons*, 1 F.3d 924 (9th Cir. 1993). Thus, confinement at home simply is distinguishable from confinement within a prison, and one's liberty interests are different in each setting.

Finally, the government suggested for the first time at oral argument that *Morrissey*, *Young*, and *Kim* are inapplicable because Petitioner did not have a reasonable expectation that she would remain on home confinement, and thus her reincarceration did not implicate any liberty interest.  It posited that the "core principle" of *Morrissey* and its progeny is the inmate's reasonable expectation, and it implied that these reasonable expectations are dispositive of whether a liberty interest exists.  To be sure, the Supreme Court stated in *Morrissey* that "[i]mplicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole," 408 U.S. at 479, and also that the parolee relies on that implicit promise, *id.* at 482.   But it is not clear how heavily this promise or this reliance weighed in the overall analysis.  In *Young*, the Court considered a similar argument that the pre-parolee did not rely on any "implicit promise," but there, again, it was one of many arguments considered and rejected.  520 U.S. at 150–51.  It is not clear that, had the Court agreed with the argument, it would have arrived at a different conclusion.  *Sandin* also made clear that a restraint need not exceed a sentence in a wholly unexpected manner in order to qualify as an "atypical and significant hardship."  *Sandin*, 515 U.S. at 484.  The Court also footnoted that "[a]lthough we do not think a prisoner's subjective expectation is dispositive of the liberty interest analysis, it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed."  *Id.* at 486 n.9.  Though the comment arguably is dictum, it prevents the court from hanging the entire liberty interest inquiry on a prisoner's reasonable expectation.

Regardless of the weight to be given this factor, however, there is ample evidence in the record which could lead Petitioner to reasonably expect that she would not be

reincarcerated without cause.  In the first instance, as discussed above, it does not appear that the BOP had the authority to unilaterally revoke home confinement pursuant to its transfer powers under § 3621(b).  And as the express purpose of § 3624(c) is reintegration into society, one might reasonably expect that the BOP would not thwart such efforts absent good reason.  Also, the agreement laying out the conditions of Petitioner's home confinement does not warn that she could be removed without cause.[15]  In this way, it recalls the situation in *Young*, where the relevant regulations were silent as to the effect the governor's denial of parole would have on pre-parole.  520 U.S. at 150–51.  Here, as in *Young*, it appears that Petitioner never was informed that she could be removed from home confinement absent cause, thereby reasonably creating the implicit belief that she would not be remanded without reason.

The court also notes that the BOP does not appear to employ a widespread practice of reincarcerating individuals on home confinement, and this, too, reasonably could instill an expectation that one would continue on home confinement absent good cause for revocation.  In an address to the Senate Committee on the Judiciary (which Petitioner has provided the court), Respondent Carvajal himself stated that the BOP actively was screening the prison population for inmates who could serve the *remainder* of their sentence on home confinement.  ECF No. 31-2 at 7.  It appears, then, that even Respondent Carvajal expected that those removed to home confinement would remain on home confinement.  And in a memorandum also supplied by Petitioner (dated December 10, 2021) from BOP general counsel Ken Hyle to Assistant Attorney General

---

[15] It is not even clear that if the agreement did so state, that would be sufficient to show there is no "implicit promise."  As discussed *supra*, the statute at issue in *Morrissey* did include such a disclaimer, *Morrissey*, 408 U.S. at 492–93, but despite this, the majority found that there was an "implicit promise" made to parolees that they would remain on parole provided they abided by the conditions of their parole.

Christopher Schroeder, General Counsel Hyle indicated that individuals on home confinement only will be "transfer[red] back to secure correctional facilities if there are any significant disciplinary infractions or violations of the [home confinement] agreement." ECF No. 31-1 at 6.  General Counsel Hyle further noted that of the 4,879 individuals who had been placed on home confinement pursuant to the CARES Act, 289 had been returned to prison for violations of the conditions of home confinement or new crimes, and of those, only 79 had been returned due to technical violations.  ECF No. 31-1 at 7.  It seems clear, then, that revocation of home confinement is atypical.

Thus, even if Petitioner's reasonable expectations were dispositive, there is ample evidence from which to conclude that Petitioner did have a reasonable expectation that she would remain on home confinement absent misbehavior.  Furthermore, there is ample evidence from which to conclude that her summary reincarceration was "atypical and significant" relative to normal life in prison.  Carrying out an uninterrupted carceral sentence typically does not involve abrupt separation from one's children and employment, nor does it typically inflict the logistical chaos of an abrupt remand from the community to physical custody.  These hardships generally accompany an arrest, but generally are not revisited during the course of a term of imprisonment.  And this type of deprivation indisputably is significant.  The freedoms of privacy at home, comfort, time, and family interaction markedly differ from the demands and confines of a carceral facility. The court therefore concludes that the restraint imposed upon Petitioner satisfies the *Sandin* test.

Moreover, the court agrees that *Morrissey*, *Young*, and *Kim* are directly applicable to the case at bar.  Home confinement is a variation of traditional imprisonment that bears

the same "essential" features as the programs at issue in *Morrissey*, *Young*, and *Kim*. Petitioner was released from prison, before the completion of her sentence, on the condition that she abide by certain rules.  She was able to work, she was able to go to school, and she was able to reunite her family.  In sum, she enjoyed substantial liberty. The liberty of an individual on home confinement, like that of a parolee, thus "includes many of the core values of unqualified liberty," and "[i]ts termination calls for some orderly process, however informal."  *Morrissey*, 408 U.S. at 482.

Therefore, the court must conclude that Petitioner had a liberty interest in being free from the arbitrary revocation of her home confinement.  Of course, this is not to say that Petitioner never could have been returned to prison once she was released to home confinement, nor that good cause did not exist for her reincarceration.  The court's conclusion merely is that she was entitled to certain process before she was reincarcerated.

### iii.  *Procedure Due*

It still must be determined, though, what procedural protections ought to have been afforded Petitioner before the revocation of her home confinement.  Petitioner argues she was entitled to those protections laid out by the United States Supreme Court in *Morrisey*, a relatively comprehensive two-step process that affords inmates the opportunity to answer the allegations laid against them and to challenge the sanction imposed. Respondents argue that Petitioner only was entitled to the lesser protections laid out in *Wolff*, and that those protections were satisfied by her disciplinary hearing.

The court agrees with Petitioner.  In *Young*, the Supreme Court affirmed the Tenth Circuit's holding that *Morrisey* protections were warranted because the pre-parole

program at issue so closely resembled *Morrissey*'s parole program. *Young,* 520 U.S. at 152–53. Because Petitioner's home confinement bears such strong resemblance to the parole program in *Morrisey* (as this court concluded at pages 24–25, *supra*), Petitioner had a liberty interest that triggered due process protections as described in *Morrissey*.

In determining the procedures required in *Morrissey*, the Supreme Court recognized that when an individual on release is accused of committing a crime, there is a strong governmental interest in being able to return them to secure custody without a full-scale prosecution (to avoid the potential for additional allegedly criminal conduct). *Morrissey*, 408 U.S. at 483. However, the Court also recognized that summary treatment was inappropriate in assessing the conduct of one individual not then in a prison setting (because the concerns of managing a large and potentially disruptive prison population would not apply). *Id.* The Court also noted that society itself has a stake in a parolee's rehabilitation, articulating a societal interest in (1) furthering efforts toward rehabilitation by avoiding improper revocation, and in (2) treating people fairly so that distrust from arbitrary punishment does not hamper their rehabilitation. *Id.* at 484. After all, arbitrary or unjust punishment also can result in the general public's distrust of our institutions.

These same considerations are present in the case at bar. Individuals on home confinement have been convicted of criminal conduct, and there must be a fair and efficient way to assess whether they should be reincarcerated. However, allegations that a single individual has violated the technical terms of her home confinement do not justify the summary treatment Petitioner received. Given that Congress's express purpose for home confinement is reintegration into the community as productive societal members, this case shares that societal goal of fostering inmate rehabilitation.

Moreover, *Wolff* is clearly distinguishable. *Wolff* dealt with inmates in a custodial prison setting, *see McDonnell v. Wolff*, 342 F.Supp. 616 (D.Neb. 1972), who were denied "good time" jail credit; there, the Supreme Court found that a lesser degree of protection satisfied due process since "the deprivation of good time is not the same immediate disaster [for the prison inmate] that the revocation of parole is for the parolee." *Wolff*, 418 U.S.at 561. But like the revocation of parole (which remands someone from the community back to custodial prison), and unlike the loss of good time (as to a prisoner then remaining in physical custody), the revocation of home confinement has an immediate disastrous effect on an inmate's physical liberty. The court notes, too, that, unlike the loss of good time, the revocation of parole and the revocation of home confinement cause significant and immediate logistical concerns, such as needing to find childcare, or explaining a prolonged absence to an employer; inmates in prison who lose good time certainly are impacted, but not in those same ways.

For the foregoing reasons, this court finds that procedural due process protections must be exercised before home confinement may be revoked; specifically, the two-step *Morrissey* process must be followed. The first step after an alleged home confinement violation is a preliminary hearing to determine whether there is probable cause to justify the inmate's detention (prior to the hearing required to satisfy the second *Morrissey* step). *Morrissey*, 408 U.S. at 485–87. This first phase allows for an inmate's rapid detention upon a finding of mere probable cause that she violated her conditions of home confinement, but the factfinder should be an uninvolved individual who did not initiate the revocation process. *Id.* at 485 (finding that someone "not directly involved in the case" should determine whether probable cause exists to justify an inmate's detention). At the

same time, the person presiding over this preliminary detention hearing need not be a judge.  *Id.* at 486.  Additionally, the preliminary probable cause hearing should be "at or reasonably near the place of the alleged [home confinement] violation or arrest" and take place "as promptly as convenient" after the alleged violation.  *Id.* at 485.  The inmate must be given notice as to the hearing and as to the alleged violations to be considered therein, and in most cases should have the opportunity to cross-examine adverse witnesses.  *Id.* at 487.  The inmate should have the opportunity to present evidence and defenses, and, if she chooses, to testify on her own behalf.  *Id.*  And upon ruling, the hearing officer should articulate the reasons for her decision and the evidence upon which she relied, but these need not be formal findings of fact and conclusions of law as would be expected at a final determination of whether the home confinement status should be revoked.  *Id.*

If probable cause is found to justify the inmate's detention from home confinement, a revocation hearing still must be conducted before the inmate's home confinement is revoked altogether.  *Id.*  The minimum procedural due process requirements at this second phase (revocation hearing) under *Morrissey* include (a) written notice of the alleged violations; (b) disclosure of evidence against the accused; (c) an opportunity for the accused to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and to cross-examine adverse witnesses (unless good cause exists to deny such confrontation); (e) a "neutral and detached" hearing body; and (f) a written statement by the factfinders delineating the result of the hearing and, if home confinement is revoked, the reasons therefor and the evidence relied upon.  *Id.* at 489.[16]

---

[16] Petitioner makes an argument that she also was entitled to have counsel at the hearing, based on the Supreme Court's holding in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) that, under certain circumstances, a parolee or probationer may be entitled to counsel at certain revocation hearings.  It is not clear that Petitioner would fit the parameters the Court laid out in *Gagnon*, even if the court were to find *Gagnon*

The revocation hearing must take place within a reasonable period of time, but since it is more involved than the (first phase) preliminary detention hearing, reasonable delays[17] are understandable and permitted.  *Id.* at 488.

Finally, it appears that *Morrissey* did not specify the burden of proof by which an inmate's revocation of home confinement should be considered; to the extent that this discretion rests with the district court, this court respectfully finds the applicable burden for revocation hearings to be a preponderance of the evidence.  This burden is applied in hearings for revocation of probation and supervised release.  *See* 18 U.S.C § 3583(e)(3). *See also United States v. Teran*, 98 F.3d 831, 836 (5th Cir. 1996); *United States v. Bujak*, 347 F.3d 607, 609 (6th Cir. 2003).

### iv.  *Process given to Petitioner*

Turning to Respondents' third argument (that Petitioner was afforded all the process she was due prior to the revocation of her home confinement), the court is unpersuaded.  Petitioner's revocation indeed resulted from two distinct proceedings: a disciplinary proceeding that addressed only the third alleged violation of conditions but that did provide some procedural protections, and a second proceeding which cumulatively addressed all three alleged violations (without prior review of the first two

---

[17] applicable.  But the Supreme Court, only a few years after issuing the *Gagnon* opinion, issued *Wolff*, in which they stated that they were "not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings."  *Wolff*, 418 U.S. at 570 (1974).  Moreover, assistance of counsel is not included among the minimum requirements listed in *Morrissey*.  In fact, in *Morrissey*, the Court specifically avoided finding that parolees are entitled to counsel, implying that the assistance of correctional staff would suffice.  *Morrissey*, 408 U.S. at 489 n.16.  Petitioner therefore has failed to convince the court on this point.

[17] The *Morrissey* court left room for judicial discretion in determining whether a revocation hearing took place within a reasonable period of time, but it noted that a "lapse of two months" between the preliminary and revocation hearings "would not appear to be unreasonable."  *Id.* at 488.

alleged violations) but for which Petitioner was afforded insufficient procedural due process.

At her preliminary hearing, Petitioner was given notice of the proceeding (she waived her right to a full 24 hours' notice of the proceeding), and was afforded an opportunity to present evidence and to be heard.  She declined the assistance of a BCRC staff member as well as the opportunity to present any witnesses or evidence, save her submission of a written statement.  A neutral body considered that written statement and Petitioner's oral statement, and then issued a written summary of its conclusions; the summary then was reviewed by an impartial DHO.

This initial hearing satisfied the first step of *Morrissey*, and thus Petitioner's detention (pending her revocation hearing) passed constitutional muster.[18]  However, Petitioner was afforded no apparent procedural process before her home confinement was revoked. Rather, the decision was made by Respondent McFarland, alone, and was communicated to BCRC staff via email without any involvement from Petitioner or from an impartial body.  Petitioner was given no opportunity to address the first two violations, at least one of which appears to have involved mitigating circumstances, and she was given no opportunity to challenge the decision to revoke her home confinement.  Any concessions or admissions she made at her preliminary (probable cause) hearing do not constitute her knowing and voluntary concessions at what should have been a second-

---

[18] Although Petitioner's initial disciplinary hearing assessed only one of the three violations that supported her remand to prison, there is no legal requirement that the government prove *all* alleged violations before an inmate is detained.  Proof of a single violation appears sufficient to justify a remand to custody.

phase proceeding to consider the revocation of her home confinement while employing a

higher burden of proof (the preponderance of the evidence standard).[19]

For the foregoing reasons, this court finds that Respondents violated Petitioner's

due process rights in revoking her home confinement without a proper revocation hearing

as described in *Morrissey*.  Therefore, her habeas petition must be granted on this claim.

      **v.  *Remedy***

Petitioner seeks multiple forms of relief for Respondents' violation of her

procedural due process rights.  *See* ECF 1 at 14–15.  She seeks her immediate release

(while awaiting a revocation hearing that complies with due process), declarations that

Respondents have insufficient basis under the Due Process Clause to detain her and that

her imprisonment is unlawful, an injunction against Petitioner's continued imprisonment

until her due process rights have been restored, and reasonable attorneys' fees and

costs.

With respect to the request for Petitioner's immediate release, the court notes that

as of May 31, 2022, "Petitioner was transferred from secure custody at FCI Danbury, to

supervision in the community (New York RRM in Brooklyn, NY)."  ECF No. 22 at 1.  To

the extent that Petitioner still asks the court to order her return to home confinement, the

court notes that the proper remedy for a deprivation of due process is the process itself.

See *Muhmmaud v. Murphy*, No. 3:08-CV-1199 (VLB), 2009 WL 4041404, at *7 (D. Conn.

Nov. 19, 2009) (citing *U.S. ex rel Bey v. Conn. State Bd. of Parole*, 443 F.2d 1079, 1089–

---

[19] The court recognizes that in the written statement presented at her disciplinary hearing, Petitioner wrote that she "made a bad call" in deciding to stop at the AT&T store on her way home from the BCRC, and that it was a "bad decision."  ECF No. 14-2 at 19.  Respondents have implied that these are admissions of guilt. The court need not and does not make any determination on that point.  Similarly, the court need not and does not consider the admissibility of the written statement at any second-phase revocation hearing.

90 (2d Cir.1971) (concluding that proper remedy for improper parole revocation hearing was new revocation hearing), vacated on other grounds by, *Conn. State Bd. of Pardons v. Bey*, 404 U.S. 879 (1971)).  Additionally, this court has determined that it is not unlawful for Petitioner to be detained at a reentry center pending a second-step revocation hearing. *See supra* at 30.  Thus the request for her immediate release is denied without prejudice, subject to renewal should the BOP fail to conduct a proper revocation hearing within a reasonable period of time.

As to the requests that the court order declaratory relief, it declines to exercise its discretion under the DJA to do so.  *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.") (emphasis added); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."). Not only does the finding of a constitutional violation render any such declaration duplicative, but declaratory judgment generally is not used to grant retrospective relief, particularly in cases where the defendant is a government entity.  *See Green v. Mansour*, 474 U.S. 64, 67–68 (1985) (declining to find retrospective declaratory relief appropriate under either the Declaratory Judgement Act or the Eleventh Amendment).  As to the request for an award of attorneys' fees and costs, Petitioner has not identified the fees and costs she incurred in retaining counsel from law school legal clinics, nor (even if such costs and fees were incurred) the authority upon which the grant

of such a reward would rest.  The request for attorneys' costs and fees therefore is denied without prejudice to renewal.

Finally, the court finds that Petitioner's request for injunctive relief is moot, in that she no longer is in the physical custody of a prison.

### b. Eighth Amendment, Substantive Due Process, *Accardi*, and Rehabilitation Act Claims

The court notes that the briefs from each party fail to offer substantial discussion of Petitioner's other claims.  The MTD discusses only the procedural due process claim, and Respondents in reply made only cursory arguments for dismissal of the *Accardi* and Rehabilitation Act claims (to which Petitioner did not respond).  Nevertheless, the court dismisses these remaining claims raised by Petitioner.

The court finds that Petitioner's *Accardi* claim is mooted, as the only relief to which she would be entitled were she to prevail on that claim would be another hearing, which the court has ordered as to her procedural due process claim.  *See Accardi*, 347 U.S. at 268 (finding that the petitioner should receive a new hearing).

Petitioner has also failed to assert sufficient facts to carry her Rehabilitation Act claim, declaring only that she suffers from anxiety, depression, and migraines and that Respondents denied her effective access to the home confinement program.  She states that the BOP did not provide her with accommodations that would allow her to meaningfully participate in the program, but she does not state what those accommodations might be or how withholding them impinged on her ability to participate in home confinement.  Petitioner therefore has failed to state this claim.

And with respect to Petitioner's substantive due process claim, it is unclear which specific right Petitioner claims has been violated. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . ." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). "The first step in substantive due process analysis is to identify the constitutional right at stake." *Id.* Petitioner asserts that her reincarceration was "egregious, arbitrary, and shocks the conscience," ECF No. 1 at ¶ 49, but she fails to identify the predicate constitutional right. Therefore, Petitioner has failed to state this claim as well.

Finally, Petitioner asserts that her reimprisonment was "excessive and grossly disproportionate" to the violation of, as she describes it, stopping at the cell phone store. Such conduct was an alleged violation of the terms of Petitioner's home confinement. It is unclear whether she disputes that such conduct constituted a violation, or whether she argues that, even if the conduct was a violation of her home confinement, she never could have been reincarcerated for it. The latter claim, the court notes, would require a significant extension of existing Eighth Amendment jurisprudence. The court cannot entertain a claim with such great constitutional import on such a sparse allegation.

Finally, as discussed *supra*, the court is disinclined to exercise jurisdiction over the DJA claim. Thus, all other Counts asserts in the Petition, aside from Count One, hereby are dismissed.

34

IV.     **CONCLUSION**

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1.  The Petition for Writ of Habeas Corpus, ECF No. 1, is **GRANTED in part**.

    a.  The court grants the Petition with respect to Count One.

    b.  With respect to the remedy for the Count One violation, Respondents are instructed to make arrangements forthwith consistent with this order.

2.  The Motion to Dismiss, ECF No. 14, is **GRANTED in part**.  Counts Two, Three, Four, Five, and Six hereby are dismissed.

3.  The court respectfully asks the Clerk of Court to close this case.

    **SO ORDERED** in Hartford, Connecticut, this 9th day of August, 2022.


                                         /s/
                                OMAR A. WILLIAMS
                                UNITED STATES DISTRICT JUDGE